Paul WILLIAMS, Plaintiff,

v.

Michael WRIGHT, James Hunt, Richard Horn, David Richardson, Jack Wong, Kernen Bagley, Ray Hume, Everette Langford, Charles Hill, Howard Mayhew, Robert Trummer, Neil Gearhart, Ron Still, Robert Steele, Donald McNamara, Dan Brown, Stanley Kerner, John Brown, and J. Bard Purcell, Defendants.

Civ. No. 74–614.

United States District Court,
D. Oregon.

Aug. 10, 1976.

Alan K. Brickley, Peterson, Susak & Peterson, P. C., Portland, Or., for plaintiff.

Sidney I. Lezak, U. S. Atty., Charles H. Turner, Asst. U. S. Atty., D.Or., Portland, Or., for defendants Wright, Hunt, Horn, Richardson, Wong, Bagley, Hume and Langford.

William R. Canessa, Asst. Atty. Gen., Salem, Or., Hershiser, Mitchell & Warren, Portland, Or., for defendants Hill, Mayhew, Trummer, Gearheart, Still, Steele, and McNamara.

Ronald E. Bailey, Thomas A. Gordon, Bullivant, Wright, Leedy, Johnson, Pendergrass & Hoffman, Portland, Or., for defendants Brown, Kerner, Brown, and Purcell.

SKOPIL, District Judge.

Plaintiff was arrested in Portland, Oregon, on August 13, 1972, while consummating a sale of drugs to an informant.[1] Two witnesses to the arrest thought they saw plaintiff swallow something.[2] Narcotics agents suspected that plaintiff had attempted to dispose of incriminating drugs. During his subsequent confinement in the city jail and in Rocky Butte Jail, plaintiff was placed in restraints to prevent interference with stool examinations conducted by the agents in the hope of retrieving evidence. The restraints were terminated only when physical tests to which plaintiff voluntarily submitted showed an absence of narcotics in his body.

In this civil rights action plaintiff seeks compensatory and punitive damages from eight federal employees,[3] seven members of the Portland Police Department,[4] and four

1. Plaintiff was subsequently convicted of four separate offenses arising from the drug transaction and plaintiff's possession of a firearm.

2. The witnesses were the informant, Joseph Siri (Criminal Trial Transcript, at 70), and defendant Charles Hill, of the Portland Police Department's Narcotics Detail (Tr. 330–332, 339).

3. Assistant United States Attorney Jack Wong; United States Marshal Everett Langford and Deputy Marshals Kernan Bagley and Ray Hume; and Special Agents David Richardson, Michael Wright, James Hunt, and Richard Horn, of the Bureau of Narcotics and Dangerous Drugs (now the Drug Enforcement Administration) ("federal defendants").

4. Donald McNamara, Chief of Police; Robert Steele, Deputy Chief of Police; Ron Still, lieutenant in charge of Special Investigations Division; and Sergeant Charles Hill and Officers Robert Trummer, Howard Mayhew, and Neil Gearheart, of the Narcotics Detail ("city defendants").

Multnomah County employees [5] as a result of the conditions of his confinement in these jails. Plaintiff bases his claim for relief on 42 U.S.C. §§ 1983 and 1985 and on the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. More specifically, plaintiff complains that he was shackled and deprived of food and water while at the city jail and was shackled, deprived of food and water, denied personal hygiene, and not allowed to contact his attorney while at Rocky Butte Jail.

On May 23, 1975, the federal defendants filed a motion to dismiss or, in the alternative, for summary judgment. The motion was denied without opinion by order of January 14, 1976. Subsequently the federal defendants filed a motion for reconsideration on the grounds previously asserted and, in addition, on the ground that the matter merited oral argument. After hearing oral argument, considering additional authorities submitted by the parties, and thoroughly rereading all briefs and documents in the record, I have concluded that some of the grounds asserted are meritorious and that a fuller discussion of the reasons for my decision is warranted.

The arguments advanced by the federal defendants are discussed in the order listed below:

1. The court lacks subject matter jurisdiction over plaintiff's claim that the federal defendants violated 42 U.S.C. §§ 1983 and 1985 because these statutes do not apply to federal officials.

2. Summary judgment in favor of defendants Horn, Bagley, and Hume is appropriate because there is no evidence linking them to the conditions of plaintiff's confinement.

3. Absolute quasi-judicial immunity requires that the claim against defendant Wong be dismissed.

4. All federal defendants are entitled to dismissal or summary judgment based on the principle of qualified official immunity.

The established and disputed facts are set forth first by way of background.

### FACTS [6]

*The Arrest*

Plaintiff and several other persons were arrested in the parking lot of the Airtel Motel at 8:35 p. m. on August 13, 1972. Law enforcement officials participating in the surveillance and arrests were defendants Hill, Trummer, Mayhew, and Gearheart and Officer David Petry [7] of the Portland Police Department's Narcotics Detail and defendants Richardson, Wright, Hunt, and Horn of the Federal Bureau of Narcotics and Dangerous Drugs. Hill, who effected plaintiff's arrest on a state firearms charge, was assisted by Trummer, Richardson, and Horn in stopping one vehicle and arresting its occupants. Wright, Hunt, and Gearheart, working together, apprehended suspects in other vehicles. Mayhew and Petry aided in the arrests.

*Confinement at the City Jail*

Following his arrest, plaintiff was lodged for a short time in the city jail. No one will admit to having transported plaintiff or participated in the booking process. Defendants Hill and Trummer say they left plaintiff at the scene of the arrest in the

---

**5.** J. Bard Purcell, Director of the Department of Public Safety; John Brown, Chief of the Corrections Division; Stanley Kerner, Jail Commander; and Dan Brown, Corrections Supervisor on the evening shift ("county defendants").

**6.** The facts are derived from the following documents in the record: defendants' answers to plaintiff's interrogatories, documents produced by defendants in response to plaintiff's requests for production, exhibits submitted by the federal defendants in support of their motion for dismissal or summary judgment (including the transcript of plaintiff's federal criminal trial), and affidavits submitted by plaintiff in opposition to the motion. Many of the facts drawn from these documents are not seriously disputed, although minor discrepancies have had to be resolved. These facts are set forth as though they were established facts. All of the significant facts in dispute are highlighted in the following discussion.

**7.** Petry was not named as a defendant in the complaint.

custody of the federal agents (Answers of Defendants Hill and Trummer to Plaintiff's Interrogatory No. 2 (First Set)). The federal agents say plaintiff was transported by the Portland Police Department and booked by defendants Hill and Trummer (Answers of Defendants Richardson, Wright, Hunt, and Horn to Plaintiff's Interrogatory No. 4 (First Set); Affidavit of Defendant Wright, at 6; Affidavit of Defendant Richardson, at 4; Affidavit of Defendant Horn, at 3; Affidavit of Defendant Hunt, at 3). Defendant Hunt, however, admits that he did process personal history forms on plaintiff and another person at the Portland Police Bureau. He also advised plaintiff at that time that he was under arrest for violation of federal narcotics laws and informed him of his constitutional rights. (Affidavit of Defendant Hunt, at 3; Criminal Trial Tr. 352–355) Defendants Richardson and Wright also admit that they eventually proceeded to the Portland Police Bureau to confer with the informant and defendants Hill and Trummer, although they deny having any further contact with the plaintiff (Affidavit of Defendant Wright, at 6–7; Affidavit of Defendant Richardson, at 4). Defendant Richardson states that he contacted defendant Wong that same night to inform him of the arrests and the agents' suspicion that plaintiff had swallowed narcotics (Affidavit of Defendant Richardson, at 4–5).

Plaintiff states in his affidavit that he was handcuffed to his cell bars and isolated from other prisoners while at the city jail (Plaintiff's Affidavit, ¶¶ 5–6). Everyone disclaims any knowledge of or responsibility for this alleged treatment, except that defendant Horn says he learned of the handcuffing sometime between August 14 and August 20, 1972 (Answer of Defendant Horn to Plaintiff's Interrogatory No. 6(g) (First Set)).

## Confinement in Rocky Butte Jail

After several hours in the city jail, plaintiff was taken by unidentified city police officers to Rocky Butte Jail, a facility operated by Multnomah County. He was booked at 2:00 a. m. on August 14, 1972, on state and federal charges. At 2:40 a. m. he was placed on the medical ward under restraints [8] to prevent him from disposing of any narcotics which might be eliminated in his stools. Plaintiff remained at Rocky Butte Jail under restraints for the next four days, except when he was removed on the occasions described below.

At approximately 7:00 a. m. on the same morning, August 14, 1972, plaintiff was taken to the city jail by Multnomah County Sheriff's bus. After state charges against him had been dropped, defendants Bagley and Hume took custody of plaintiff at approximately 2:15 p. m. and transported him to the federal courthouse for an appearance before United States Magistrate George E. Juba. Upon filing of a complaint with Judge Juba, plaintiff was advised of his rights, bail was set, an order was entered appointing counsel, and an appearance with counsel was set for August 17, 1972, at 10:30 a. m. Plaintiff was then returned to Rocky Butte Jail at approximately 5:00 p. m. by defendants Bagley and Hume. Defendant Bagley signed an order remanding plaintiff to custody in the county facility.

Plaintiff was taken to the federal courthouse again by Deputy United States Marshals on August 15, 1972, to confer with his attorney. He departed from Rocky Butte Jail at 8:05 a. m. and returned at 1:05 p. m.

On August 17, 1972, plaintiff was taken from the jail at 8:15 a. m. for his scheduled court appearance with counsel. Judge Juba granted plaintiff's motion for a reduction in bail and set the date for his preliminary hearing. Upon representations from the government and plaintiff that they agreed to tests to determine the presence of foreign materials in plaintiff's body, Judge Juba ordered the United States Marshal to make appropriate arrangements. Plaintiff was returned to Rocky Butte Jail at 2:40 p. m.

8. All prisoners on the medical ward are placed under restraints for security reasons. They are shackled to their beds by at least one arm and one leg.

Deputy United States Marshals transported plaintiff to Multnomah County Hospital at 6:45 a. m. on August 18, 1972. Tests performed at the hospital were negative for the presence of narcotics. Plaintiff was returned to Rocky Butte Jail at 10:05 a. m. and placed with the general prison population on "C" dormitory, free of restraints.

The only defendants (other than Bagley and Hume) to see plaintiff while in custody at Rocky Butte Jail were county defendant Dan Brown and federal defendants Richardson, Wright, and Hunt. Brown was supervisor of the evening shift at Rocky Butte Jail and had his first contact with plaintiff after coming on duty at 4:00 p. m. on August 14, 1972. Despite some unimportant differences in the parties' recollections, it appears that defendant Wright visited the medical ward alone on the evening of August 15, 1972, to inspect the feces collected and talked with plaintiff at that time. Defendants Richardson and Hunt saw plaintiff the next day when they visited the medical ward for the same purpose between 5:30 and 6:30 p. m.

Plaintiff states in his affidavit that he was shackled initially by one arm and one leg but was shackled by both arms and both legs from the time he returned from his first court appearance until he was transferred out of the medical ward. Plaintiff also states that he was given only one meal (on August 16, 1972), was refused water, was denied personal hygiene, and was not allowed to contact his attorney or make any telephone calls while on the medical ward at Rocky Butte Jail. (Plaintiff's Affidavit, ¶¶ 8, 10, and 19) Glenn Mintun, the medic who came on duty on the medical ward the morning of August 14, 1972, confirms that plaintiff was denied food. Mintun testified at plaintiff's trial that his orders were that plaintiff was to receive nothing by mouth, i. e., no food, and that plaintiff was fed only twice during this period—a light meal on August 14 about 6:00 p. m. and a second meal on August 17 (Criminal Trial Tr. 27–29, 31, 33–34).

Plaintiff further states in his affidavit that he repeatedly requested while incarcerated in the medical ward that he be given internal tests to determine whether drugs were present in his body but that all his requests were denied (Plaintiff's Affidavit, ¶¶ 11 and 13). A number of witnesses acknowledge that plaintiff made such requests (testimony of Glenn Mintun, Criminal Trial Tr. 31; testimony of defendant Wright, Criminal Trial Tr. 265; Affidavit of Donald McClain, at 2; testimony of defendant Richardson, Criminal Trial Tr. 324–325; Affidavit of Defendant Wong, ¶ 16).

Some of plaintiff's contentions are controverted by other evidence in the record. Although everyone admits plaintiff was shackled by at least one arm and one leg, several witnesses contradict plaintiff's statement that he remained shackled by both arms and both legs after the first morning (e. g., testimony of Glenn Mintun, Criminal Trial Tr. 23; testimony of defendant Wright, Criminal Trial Tr. 265; testimony of defendant Richardson, Criminal Trial Tr. 323). Defendant Dan Brown claims that toothpaste, towels, soap, etc. were made available to plaintiff and that he was given evening meals the same as other inmates (Answer of county defendants to Plaintiff's Interrogatory No. 11 (First Set)). Defendant Wright and defendants Richardson and Hunt report plaintiff was eating when they visited the medical ward on the evenings of August 15 and 16, respectively (testimony of defendant Wright, Criminal Trial Tr. 264; Answers of defendants Richardson, Wright, and Hunt to Plaintiff's Interrogatory No. 11 (First Set)).

When it comes to assigning responsibility for the conditions of plaintiff's confinement at Rocky Butte Jail, everyone points his finger at someone else. The county defendants say that defendant Hill gave the instructions for plaintiff's shackling to Sergeant Dennis Puddy, the shift supervisor on duty when plaintiff arrived at the jail, but that the federal authorities were ultimately responsible for those instructions (Answers of County Defendants to Plaintiff's Interrogatories No. 9, 19, 20, 33 (First Set) and No. 1, 2 (Second Set); see initial entry on

Correction Section Medication Record submitted by county defendants).

Defendant Hill cannot recall giving any instructions to personnel at Rocky Butte Jail (Answers of Defendant Hill to Plaintiff's Interrogatories No. 9 (First Set) and No. 1 (Second Set)). All other city defendants disclaim knowledge of or responsibility for the conditions of plaintiff's confinement.

All the federal defendants also disclaim responsibility for the conditions of plaintiff's confinement. Defendant Wong says that plaintiff was shackled initially under orders from defendant Hill and Sergeant Puddy (Affidavit of Defendant Wong, ¶ 12). Although defendant Langford contacted Rocky Butte Jail at Wong's request on the afternoon of August 14 to see if arrangements could be made to examine plaintiff's tools, both Wong and Langford indicate that they did not order plaintiff shackled or deprived of food and water and that they had no control over conditions at the county facility (Affidavit of Defendant Wong, ¶¶ 14, 18, 19, 20; Affidavit of Defendant Langford, ¶¶ 3(g), 4, 6). Further, Wong's request to Langford was made only after the following steps had been taken on the morning of August 14: (1) Attorney Jeffrey M. Kilmer [9] contacted a Public Health Service doctor and learned that swallowing narcotics would not place plaintiff's health in jeopardy and that any narcotics could no longer be recovered except through normal elimination. (2) Kilmer requested a search warrant from Judge Juba authorizing minimal restraints necessary to prevent plaintiff from destroying any narcotics which might be evacuated. Judge Juba refused to entertain the request because he believed a warrant unnecessary under the circumstances as explained to him. (3) Legal research was conducted concerning body cavity searches, and Kilmer and Wong concluded that the contemplated actions were lawful. (Affidavit of Defendant Wong, ¶¶ 7–11; Affidavit of Jeffrey M. Kilmer).

### § 1983 AND § 1985 CLAIMS

■ Plaintiff's claim against the federal defendants under 42 U.S.C. § 1983 [10] must be dismissed. That statute, by its own term, applies to persons acting under color of *state* law. It does not extend to persons acting under color of *federal* law. *Soldevila v. Secretary of Agriculture of the United States*, 512 F.2d 427, 429 (1st Cir. 1975); *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1346 (2d Cir. 1972); *Bethea v. Reid*, 445 F.2d 1163, 1164 (3d Cir. 1971), cert. denied, 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972); *Norton v. McShane*, 332 F.2d 855, 862 (5th Cir. 1964), cert. denied, 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965); *Smith v. United States Civil Service Commission*, 520 F.2d 731, 733 (7th Cir. 1975); *Williams v. Rogers*, 449 F.2d 513, 517 (8th Cir. 1971), cert. denied, 405 U.S. 926, 92 S.Ct. 976, 30 L.Ed.2d 799 (1972). Cf. *District of Columbia v. Carter*, 409 U.S. 418, 423–424, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (holding § 1983 inapplicable to the District of Columbia and members of its police department).

■ The federal defendants similarly argue that 42 U.S.C. § 1985 [11] does not apply

9. Kilmer occupied the position of Senior Deputy District Attorney for Multnomah County and served as the Multnomah County District Attorney's liaison to the Office of Drug Abuse Law Enforcement under the United States Department of Justice. Kilmer also held an appointment during his period as Special Attorney with the United States Department of Justice.

10. Section 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

11. Plaintiff presumably relies upon the following portion of § 1985(3):
"If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal pro-

to federal officers. The language of § 1985, however, differs from that of § 1983, including any "person" who "conspires". Some courts nevertheless have concluded that § 1985 does not encompass the actions of federal officials. *Bethea v. Reid, supra; White v. Boyle,* 390 F.Supp. 514, 515 (W.D. Va.1975); *Moore v. Schlesinger,* 384 F.Supp. 163, 165 (D.Colo.1974); *Williams v. Halperin,* 360 F.Supp. 554, 556 (S.D.N.Y. 1973). I find more persuasive the reasoning in *Revis v. Laird,* 391 F.Supp. 1133, 1138 (E.D.Cal.1975), appeal docketed, No. 75–2473, 9th Cir., July 8, 1975, holding to the contrary.

 Although I reject the federal defendants' argument that federal officers can never be subjected to a civil action under § 1985, plaintiff's claim against them based on that statute must be dismissed for a different reason. The alleged violations of plaintiff's constitutional rights are not within the scope of the activities giving rise to liability under that statute. As noted by the United States Supreme Court in *Griffin v. Breckenridge,* 403 U.S. 88, 101–102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971):

> "That [§ 1985(3)] was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others. . . . The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. [citation omitted] The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously

discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." (footnotes omitted) (emphasis in original)

Plaintiff's complaint does not allege any form of class-based discrimination. His § 1985 claim against the federal defendants must therefore be dismissed for failure to state a cause of action. *Arnold v. Tiffany,* 487 F.2d 216 (9th Cir. 1973), cert. denied, 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974).

Plaintiff's case against the federal defendants does not stand or fall based upon his § 1983 and § 1985 claims. The complaint against these defendants is also predicated upon *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The remaining contentions of the federal defendants must be evaluated in the context of plaintiff's *Bivens*-type claim.

## LIABILITY OF DEFENDANTS HORN, BAGLEY, AND HUME

During oral argument on the motion for reconsideration, counsel for the federal defendants urged the court to grant summary judgment in favor of defendants Horn, Bagley, and Hume on the ground that the record is devoid of any evidence against them. My review of the record has convinced me that summary judgment in favor of these defendants is appropriate. As to them, there is no genuine issue of material fact within the meaning of Fed.R.Civ.P. 56(c). The conclusionary allegations against them contained in plaintiff's complaint are refuted by uncontradicted evidence.

Defendant Horn's only contact with plaintiff occurred at the time of his arrest.

---

tection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or

deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

Horn states in his affidavit and answers to interrogatories that he did not see plaintiff thereafter and had no personal knowledge of or responsibility for the conditions of plaintiff's confinement. There is no evidence contradicting Horn's statements.

Defendants Bagley and Hume first came into contact with plaintiff when they took custody of him at the city jail on the afternoon of August 14, 1972. Following his court appearance, they returned him to Rocky Butte Jail. Both defendants deny having any personal knowledge of the conditions of plaintiff's confinement there and disclaim any responsibility for them. The orders to shackle plaintiff had been given to jail personnel and put into effect before Bagley and Hume delivered plaintiff back to the jail.[12] The sole evidence linking these defendants to the conditions of plaintiff's confinement consists of the county defendants' answers to two interrogatories. The first answer states that instructions for plaintiff's confinement at Rocky Butte Jail were given "on behalf of the Deputy U.S. Marshal by Officer Hill of the Portland Police Department" (Answer of County Defendants to Plaintiff's Interrogatory No. 9 (First Set)). The statement does not identify either defendant as the deputy involved. In answer to another interrogatory, the county defendants state that "Deputy United States Marshals accepted and returned Plaintiff to and from the jail ward on three separate occasions, and were aware that Plaintiff was in restraints to comply with certain conditions involved with a federal criminal charge" (Answer of County Defendants to Plaintiff's Interrogatory No. 19 (First Set)). The record does not identify defendants Bagley and Hume as the deputies in question. Nor does the county defendants' statement contradict these defendants' denial of personal knowledge or responsibility.

## ABSOLUTE QUASI-JUDICIAL IMMUNITY

Defendant Wong claims that he is entitled to judgment as a matter of law on the basis of the absolute quasi-judicial immunity with which he is vested as an Assistant United States Attorney. The Supreme Court has recognized the existence of such immunity for prosecuting attorneys in the context of both common-law actions for malicious prosecution, *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), aff'd per curiam, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395, (1927), and § 1983 suits, *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The same principle of immunity is equally applicable to an action brought against a federal officer under *Bivens. Mark v. Groff*, 521 F.2d 1376, 1380 (9th Cir. 1975); *Flood v. Harrington*, 532 F.2d 1248, 1251 (9th Cir. 1976).

The claim of quasi-judicial immunity cannot, however, be resolved by resort to Supreme Court cases alone. The prosecutorial activities challenged in *Imbler* (the use of false and misleading testimony at trial and the suppression of other evidence) were clearly an "integral part of the judicial process". The Court expressly declined to consider whether a prosecutor is entitled to quasi-judicial immunity when he acts as an administrator or investigator rather than an advocate:

"It remains to delineate the boundaries of our holding. As noted, *supra*, at 416 [96 S.Ct., at 988], the Court of Appeals emphasized that each of respondent's challenged activities was an 'integral part of the judicial process.' 500 F.2d [1301], at 1302. The purpose of the Court of Appeals' focus upon the functional nature of the activities rather than respondent's status was to distinguish and leave standing those cases, in its circuit and in some others, which hold that a prosecutor engaged in certain investigatory activities enjoys not the absolute immunity associated with the judicial process, but only a good-faith defense comparable to the policeman's. See *Pierson v. Ray*, 386 U.S. [547], at 557 [87 S.Ct. 1213, at 1219, 18 L.Ed.2d 288]. We agree with the Court

---

12. Defendant Langford, the United States Marshal, completed his conversation before defendants Bagley and Hume arrived there with plaintiff (Affidavit of Defendant Langford, ¶ 3).

of Appeals that respondent's activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force. *We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast.him in the role of an administrator or investigative officer rather than that of advocate.* We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." 424 U.S. at 430, 96 S.Ct. at 995 (footnotes omitted) (emphasis added).

*Imbler* thus leaves intact the law of the Ninth Circuit (where the case arose) on the scope of quasi-judicial immunity.[13] The leading case in the Circuit is *Robichaud v. Ronan,* 351 F.2d 533 (9th Cir. 1965). The complaint in *Robichaud* alleged that the defendants (the County Attorney and his deputy) or persons acting at their direction had sought to intimidate the plaintiff and force her to confess to a crime she had not committed. The trial judge dismissed the action. On appeal, the Ninth Circuit reversed, holding that absolute immunity would protect the defendants only if the alleged acts were committed by them "in the performance of an integral part of the judicial process." *Id.* at 536. If the acts were committed by them while acting in the role of a policeman, however, absolute quasi-judicial immunity would not apply:

"We believe, however, that when a prosecuting attorney acts in some capacity other than his quasi-judicial capacity, then the reason for his immunity—integral relationship between his acts and the judicial process—ceases to exist. If he acts in the role of a policeman, then why should he not be liable, as is the policeman, if, in so acting, he has deprived the plaintiff of rights, privileges, or immunities secured by the Federal Constitution and laws? See Monroe v. Pape, supra,

365 U.S. [167] at 187, 81 S.Ct. 473, [5 L.Ed.2d 492]; see also Schneider v. Shepherd, 192 Mich. 82, 158 N.W. 182, L.R.A. 1916F, 399 (1916), cited in Yaselli, 12 F.2d at 405. To us, it seems neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.

. . . . .

". . . The trial court must determine the nature of the acts alleged to have been wrongfully committed, for the [defendants] may have abandoned their 'quasi-judicial' role. If they, so doing, committed acts, or authoritatively directed the commission of acts, which ordinarily are related to police activity as opposed to judicial activity, then the cloak of immunity should not protect them." *Id.* at 536–537.

■ Under *Robichaud* I must analyze the nature of the acts which defendant Wong is alleged to have committed and must determine whether these acts are more closely related to police activity or to judicial activity. The plaintiff alleges that defendant Wong ordered that he be shackled and deprived of food and water. Everyone admits that the purpose of the shackling was to obtain incriminating evidence against the plaintiff. These acts are so closely related to police investigative activity that quasi-judicial immunity cannot apply. Cf. *Guerro v. Mulhearn,* 498 F.2d 1249, 1256 (1st Cir. 1974) (district attorney alleged to have cooperated with police defendants in obtaining a search warrant based on perjured testimony); *Hampton v. City of Chicago,* 484 F.2d 602, 608–609 (7th Cir. 1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974) (State's Attorney and his assistant alleged to have planned a raid by police defendants in order to obtain evidence of criminal activity); *Lewis v. Brautigam,* 227 F.2d 124, 128–129 (5th Cir. 1955) (State's Attorney alleged to have ordered police defendants to photograph plaintiff in

---

**13.** The language of *Flood v. Harrington,* 532 F.2d 1248, 1251 (9th Cir. 1976), decided after the *Imbler* decision was handed down, con-

firmed that *Imbler* has not modified the approach used by the Ninth Circuit.

prison garb and to have conspired with police to extort a guilty plea from plaintiff).[14] See also *Littleton v. Berbling*, 468 F.2d 389, 410 (7th Cir. 1972), cert. denied on issue of quasi-judicial immunity, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 97 (1974).

The principle of quasi-judicial immunity does not require that the complaint be dismissed as to defendant Wong. He can, however, like the other federal defendants, rely upon the principle of qualified official immunity in his defense. *Gregory v. Thompson*, 500 F.2d 59, 65 (9th Cir. 1974).

## QUALIFIED OFFICIAL IMMUNITY

The federal defendants contend, first, that the principles set forth in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), require dismissal of plaintiff's complaint as against them. As later interpreted by other courts, *Barr* was viewed as recognizing that a federal executive official is entitled to absolute immunity if he (1) was acting within the outer perimeter of his official duties and (2) was performing discretionary (as opposed to ministerial) acts. *Green v. James*, 473 F.2d 660, 661 (9th Cir. 1973); *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339 (2d Cir. 1972). The federal defendants claim that they (particularly defendant Wong) satisfy the requirements of *Barr*.

I do not believe that this interpretation of *Barr* is the controlling law in this case. The Supreme Court has handed down a number of decisions since *Barr* which have had a profound effect upon the principle of official immunity.[15] A review of these cases convinces me that this interpretation of *Barr* can no longer stand. As stated by

the Ninth Circuit in *Mark v. Groff*, 521 F.2d 1376, 1379–1380 (9th Cir. 1975):

> "*Scheuer* . . . destroyed the notion of absolute immunity for executive officials and held that only
>
> > a *qualified* immunity is available to officers of the executive branch of Government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based.
>
> 416 U.S. at 247, 94 S.Ct. at 1692 (emphasis added). Under the qualified immunity doctrine, a government officer performing acts in the course of official conduct[4] is insulated from damage suits only if (1) at the time and in light of all the circumstances there existed reasonable grounds for the belief that the action was appropriate *and* (2) the officer acted in good faith. *Id.* at 247–48, 94 S.Ct. 1683." (footnotes omitted in part)
>
> "[4] If the officer's actions were not in the course of official conduct, he is not entitled to any qualified immunity or good faith defense. See *Hutchison v. Lake Oswego School Dist. No. 7*, 374 F.Supp. 1056 (D.Or.1974), aff'd in part, 519 F.2d 961 (9th Cir. 1975). Thus, the 'outer line of authority' test, recognized in *Barr v. Matteo* for determining when absolute immunity applies, is also relevant to a determination of qualified immunity.
>
> ". . . On remand, the trier of fact must determine whether the actions were taken 'palpably beyond authority' or whether the actions had 'more or less connection with the general matters committed by law to [their] control or supervision.' *Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896)."

See also *Midwest Growers Cooperative Corporation v. Kirkemo*, 533 F.2d 455, 463–464 (9th Cir. 1976).[16]

---

**14.** Although the distinction between absolute and qualified immunity is not discussed in *Midwest Growers Cooperative Corporation v. Kirkemo*, 533 F.2d 455, 463–464 (9th Cir. 1976), that case appears to apply the latter form of immunity to the Regional Counsel for the Interstate Commerce Commission, the United States Attorney, and two Assistant United States Attorneys, who were alleged to have authorized an unlawful administrative investigative search.

**15.** *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

**16.** Despite the language in *Mark v. Groff*, some uncertainty may still remain in the Ninth Circuit as to whether the broader immunity of *Barr* coexists with the qualified immunity of *Scheuer*. See *Midwest Growers Cooperative*,

The federal defendants also contend that, if absolute immunity is not applicable, then their qualified immunity entitles them to summary judgment. Uncontradicted affidavits and other documents establish that each federal defendant was acting within the outer line of his authority. Each defendant states in his affidavit that his actions were taken in good faith. Each further describes in detail the facts which are asserted to establish the reasonableness of his belief that the actions taken were appropriate. Summary judgment is undoubtedly proper in some cases on the basis of such documentation. See, e. g., *Midwest Growers Cooperative, supra*; *Burgwin v. Mattson*, 522 F.2d 1213 (9th Cir. 1975), cert. denied, 423 U.S. 1087, 96 S.Ct. 879, 47 L.Ed.2d 98 (1976).

 I have concluded after careful deliberation that this is such a case insofar as the remaining federal defendants (Wong, Langford, Richardson, Wright, and Hunt) are concerned. There is no evidence in the record to support plaintiff's allegation that the federal defendants were responsible for the conditions of his confinement in the city jail. The county defendants state that the initial instructions about plaintiff's confinement in Rocky Butte Jail came from defendant Hill. Their unsupported assumption that these instructions actually originated with federal authorities is not entitled to any weight. Although defendant Wong did cause a request for observation of plaintiff to be relayed to Rocky Butte personnel on the afternoon of August 14, this request gives rise to no liability on his part. Wong's good faith is uncontroverted by the record. His request was made only after legal research and contacts with Judge Juba and a Public Health Service doctor reasonably lead him to believe that his ac-

tions were appropriate. Under these circumstances, Wong is protected from liability by qualified immunity. Since defendant Langford's only action was to relay Wong's request to jail personnel, he is likewise free from liability. Defendants´ Richardson, Wright, and Hunt played no part in determining the conditions of plaintiff's confinement but merely conducted inspections which they in good faith and reasonably believed to be proper. The motion for summary judgment must be granted as to these defendants as well.

The claims against the federal defendants based on 42 U.S.C. §§ 1983 and 1985 are dismissed. Summary judgment is granted in favor of all federal defendants.

*supra*, 533 F.2d at 464 n.22; *Burgwin v. Mattson*, 522 F.2d 1213, 1214 n.1 (9th Cir. 1975), cert. denied, 423 U.S. 1087, 96 S.Ct. 879, 47 L.Ed.2d 98 (1976). Even assuming that the federal defendants' interpretation of *Barr* still retains some vitality, the federal law enforcement officials do not meet the requirement that they were performing discretionary acts. Cf. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339 (2d

Cir. 1972). See also *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). It is somewhat more problematical whether the acts which defendant Wong is alleged to have committed are "discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority." *Barr, supra*, 360 U.S. at 575, 79 S.Ct. at 1341.